# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

```
_____
                              )
DERRICK WASHINGTON,           )
                              )
          Plaintiff,          )
                              )
                              )
v.                            )    Civil Action
                              )    No. 11-10771-PBS
PETER S. AMAND, et al.,       )
          Defendants.         )
_____)
```

## MEMORANDUM AND ORDER

April 9, 2018

SARIS, Chief U.S.D.J.

## I. INTRODUCTION

Derrick Washington brings this action pursuant to 42 U.S.C. § 1983, alleging that six corrections officers used excessive force by spraying a chemical agent while extracting him from a recreation yard at MCI Cedar Junction in Walpole, Massachusetts. He further alleges that defendant Lieutenant Glenn Doher retaliated against him for filing grievances against him and other officers. The defendants are Lieutenant Glenn Doher, Sergeant John Dankievitch, and Corrections Officers James Cronin, Jeffrey Clement, John Capodilupo, Jr., and Michael Savastano. Defendants filed a motion to dismiss or in the

1

alternative for summary judgment. After hearing, the motion is **ALLOWED** in part and **DENIED** in part. (Dkt. No. 202).

## II. FACTUAL BACKGROUND

When all reasonable inferences are drawn in favor of the nonmoving party, the following facts are taken from the admissible evidence in the record. Many facts are disputed.

### A. The Extraction and Use of Force

On September 25, 2008, Derrick Washington was moved to cell 36 in 10 Block, the segregation unit at MCI Cedar Junction. Doher Aff. ¶ 16, Dkt. No. 134; Washington Dep. at 77, Dkt. No. 216-1. On September 28, 2008, he was moved to cell 19. Doher Aff. ¶ 16; Washington Dep. at 77. On September 29, 2008, when he was reassigned back to cell 36, Washington refused to exit the 10 Block recreation cage and return to his assigned cell. Disciplinary Report, Dkt. No. 129-5 at 2. He believed cell 36 contained "black mold" that would trigger his asthma. See Video; Washington Aff. ¶ 11, Dkt. No. 216-2 at 4. Doher entered the yard and gave Washington several direct orders to exit the yard, and he refused. He also stated: "You are filing a lot of grievances against my officers." Washington Dep. Tr. at 102. After notifying the shift commander, Doher was assigned to be the leader of the extraction team. Before the team was

assembled, Doher said that the Health and Safety Officer examined cell 36 and told Doher that there was no mold in the cell. Doher Aff. ¶ 19; Washington. Dep. Tr. at 110-11.

The Superintendent of MCI Cedar Junction authorized the use of force, including the use of a chemical agent. Multiple corrections officers participated in the "planned use of force" to extract Washington from the 10 Block recreational yard after he refused to leave on his own.[1] The officers were Jeffrey Clement, James Cronin, Michael Savastano, Paul Young,[2] Sergeant John Dankievitch, and Glenn Doher, who was a Lieutenant on the day of the extraction. Dkt. No. 129-5 at 7. Defendants obtained advance authorization from the Superintendent to use force and chemical agents if necessary. See Video; Dkt. No. 129-5 at 8, 18. Jacqui Bernard, a Licensed Practical Nurse (LPN), filled out a Use Of Chemical Agents checklist at 11:40 a.m. prior to Washington's extraction, which specified no contraindications for the use of chemical agents. Dkt. No. 129-5 at 22.

---

[1] "A planned use of force occurs when the level of threat by the inmate is not immediate, *e.g.*, refusal to be put in restraints and exit a cell, threatening behavior, possession of a weapon, and property damage. There is time to activate a team, suit up in full extraction gear, and brief team members on strategy to be used. Every attempt should be made to diffuse the situation prior to a planned use of force." 103 Mass. Code Regs. 505.07.

[2] Corrections Officer Paul Young was terminated from the case on August, 3, 2017. Dkt. No. 167.

Specifically, she indicated (incorrectly) that Washington did not have asthma, any current respiratory infections, recent hospitalizations, or medical conditions that would preclude the use of force or chemical agents. Id.

An audio and visual recording of the extraction captured the event. The parties did not submit a transcript, but the discussion was mostly audible. Prior to the use of force, Intervention Specialist/Mental Health Clinician Erica Corley, LCSW, approached Washington in the recreation yard, with at least two members of the extraction team present, and asked if he was willing to comply with the order to return to his cell. Washington informed Corley and the corrections officers that they were "forcing [him] to move in a cell with black mold in it. I've complied every time [Correction Officers] asked me to move; I have no problem moving. Tell them to clean the black mold off the cell first. Once they clean it, I have no problem moving." Video. However, he said he was "highly allergic" to black mold and would not move into or clean a cell with black mold in it. See id.; Dkt. No. 129-5 at 21. He told Corley, "Lieutenant Doher said I'm forced to clean the cell by myself with black mold; I'm not doing that. Clean the cell off, I'll move inside the cell once they clean the cell off. If they can't do that, I'm not moving into a cell with black mold in it." Video. Corley informed him that the cell had been checked by

4

officers "and was capable to be lived in." Id. He retorted, "black mold is not capable to be lived in." Id. Washington told Corley "he moved five times in the last month for no reason. The reason for me moving, [Lieutenant Doher] said, was because he was reading my grievances, which is supposed to be confidential . . . . There should be no reason for him knowing that confidential information." Id. Corley informed him he would be put in the cell regardless of his wishes. Washington reasserted that he would go compliantly if the black mold was cleaned. Corley and the extraction team then left the recreation yard.

About six minutes later, the extraction team entered the recreation yard and Lieutenant Doher ordered Washington to allow them to put him in restraints. Washington repeated he would not move into a cell with black mold. He was sprayed with a chemical agent three times by Sergeant John Dankievitch. Dkt. No. 129-5 at 11, 17. Washington attempted to avoid the spray by placing a shirt in front of his face. The extraction team entered the recreation yard, took down Washington, handcuffed him, and force-walked him back into the prison. According to Washington, they slammed his head into the floor. After he requested medical treatment, the nurse offered to wash out his eyes, but he refused. According to the nurse in the medical unit, he had "superficial" lacerations on his forehead, right temple, the

left elbow, bilateral knee, and right heel.[3] He was disoriented and told the nurse, "I can't think right now." Video. He was returned to cell 36.

The defendants dispute the assertion that the cell contained black mold. Plaintiff received a disciplinary report, resulting in a guilty finding. Doher Aff. ¶ 22.

**B. History of Asthma**

Washington was born with asthma and uses an inhaler for treatment. Washington Dep. Tr. at 107; Washington Aff. ¶ 2. His medical records show that on June 23, 2008, he was prescribed albuterol for his asthma. Dkt. No. 216-2 at 10. A Chronic Disease Management form filled out on July 22, 2008 noted that Washington was using albuterol for mild or intermittent asthma. Id. at 11. On September 15, 2008, there was a fire on 10 Block. See Doher Aff. ¶ 18. Washington suffered from smoke inhalation and was unable to breathe after smoke came through his door. He submitted a request to be seen by the healthcare staff and noted that he had asthma. Dkt. No. 216-2 at 15-22. He received medical attention, and records indicated that he was an asthmatic. Id.

---

[3]   In his deposition, he also said he had a broken hand, but this claim has not been pressed in the briefs.

### C. History of Grievances

Washington has filed upwards of 30 or 40 grievances against corrections officers. Washington Dep. Tr. at 115. At one point, his grievance privileges were suspended because of the number of grievances he filed, mostly while he was in 10 block. Id. at 103-04. Some of his grievances were filed specifically about Lieutenant Doher. Others pertained to Corrections Officers who appeared to have good relationships with Lieutenant Doher. When he filed a grievance against one Corrections Officer in particular, on that same day he was moved to cell 36, the cell which allegedly contained black mold. Washington Dep. Tr. at 94-96.

Doher has written two disciplinary reports against Washington. The first on July 24, 2008 for participating in a group demonstration for which he was found guilty, and the second on December 13, 2008, for a similar offense for which he was found not guilty. Doher Aff. ¶ 22.

### III. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must

demonstrate that there is an "absence of evidence to support the nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue of material fact for trial. Quinones v. Buick, 436 F.3d 284, 289 (1st Cir. 2006). A genuine issue exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is "one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)).

**B. Qualified Immunity**

Qualified immunity protects all public officials except the "plainly incompetent [and] those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). To defeat qualified immunity, an inquiring court must ask

> whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation. Second, we inquire whether the violated right was clearly established at the time that the offending conduct occurred. The second, "clearly established," step itself encompasses two questions: whether the contours of the right, in general, were

8

sufficiently clear, and whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right.

Ford v. Bender, 768 F.3d 15, 23 (1st Cir. 2014) (internal citations omitted).

The First Circuit has recognized that applying the qualified immunity standard at this stage is difficult. "[T]he summary judgment standard requires absolute deference to the nonmovant's factual assertions (as long as those assertions are put forward on personal knowledge or otherwise documented by materials of evidentiary quality), whereas qualified immunity, when raised on summary judgment, demands deference to the reasonable, if mistaken, actions of the movant." Morelli v. Webster, 552 F.3d 12, 18-19 (1st Cir. 2009) (internal citations omitted). To ease the difficulty, the First Circuit instructs lower courts to "first identify[] the version of events that best comports with the summary judgment standard and then ask[] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Id. at 19.

## IV. ANALYSIS

### A. Excessive Force

To make out a claim of excessive force under the Eighth Amendment, a prisoner must prove an "unnecessary and wanton infliction of pain," which is not just a lack of due care but,

9

rather, an "obduracy and wantonness." Whitley v. Albers, 475 U.S. 312, 319 (1986). A corrections officer's use of excessive physical force may constitute cruel and unusual punishment even when a prisoner suffers no serious injury. Hudson v. McMillian, 503 U.S. 1, 4 (1992). The key question in determining whether excessive force was used under the Eighth Amendment when a security measure is undertaken to resolve a disturbance is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7 (citing Whitley, 475 U.S. at 320-21). See Skinner v. Cunningham, 430 F.3d 483, 488 (1st Cir. 2005).

"[N]ot . . . every malevolent touch by a prison guard gives rise to a federal cause of action," nor does "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violate[] a prisoner's constitutional rights." Hudson, 503 U.S. at 9 (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1972)). However, the fact of incarceration does "not require inmates to be subjected to the malicious whims of prison guards." DeSpain v. Uphoff, 264 F.3d 965, 978 (10th Cir. 2001). Courts look at various factors in evaluating whether the use of force was malicious and sadistic, or used in good faith, including the "need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, . . . any

efforts made to temper the severity of a forceful response," and the extent of injury suffered by an inmate. Davis v. Rennie, 264 F.3d 86, 110 (1st Cir. 2001) (citing Hudson, 503 U.S. at 7). See also Whitley, 475 U.S. at 321.

Each named defendant must be personally knowledgeable and responsible for the use of excessive force to be held liable:

> Since there is no *respondeat superior* liability under section 1983, . . . liability in damages can only be imposed upon officials who were involved personally in the deprivation of constitutional rights . . . . The requisite personal involvement of a prison official may be established by showing that the official knew of a prisoner's personal danger yet failed to provide protection.

Pinto v. Nettleship, 737 F.2d 130, 132 (1st Cir. 1984) (internal citations omitted).

The crux of Washington's argument is that the knowing use of the chemical agents on an inmate who is asthmatic constitutes excessive force. Dkt. No. 216. Generally, under Massachusetts regulations, "a planned use of force" is "authorized force" when a prisoner repeatedly fails to obey an order by refusing to be put in restraints and exit a cell. 103 Mass. Code Regs. 505-07. Spraying an inmate with chemical agents is a use of force. 103 Mass. Code Regs. 505.10. Chemical agents, like pepper spray, disable prisoners "by causing 'intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis

11

of the larynx. It sometimes also causes 'disorientation, anxiety, and panic' in the person sprayed." Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008) (*overruled on other grounds as recognized by* Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010)) (internal citations omitted). While the use of chemical agents is not excessive force per se, the amount of force used must be proportionate to the need for force. See Iko v. Shreve, 535 F.3d 225, 240 (4th Cir. 2008) (concluding that pain was wantonly inflicted by deploying excessive amount of pepper spray).

One key disputed fact issue is whether the defendants had knowledge of Washington's asthma condition prior to the use of the chemical agents. Washington alleges that all of the officers knew of his asthma. In his view, Lieutenant Doher knew of his asthma because "he was the officer residing over [sic] 10 Block while [Washington] was getting treatment for [his] asthma condition." Washington Dep. Tr. at 107. The video evidence shows that Washington informed the extraction team that he is allergic to black mold. Also, there was a fire in the unit a few weeks prior to the extraction, where Washington's asthma was triggered after inhaling smoke. He alleges that Doher "was the officer-in-charge during the incidents where [he] was being treated for [his] asthma condition. And everything goes through the officer-in-charge in 10 Block." Washington Dep. Tr. at 106.

Defendants point out that prior to the use of the chemical agent, "[m]edical staff . . . was consulted to see if there were any contraindications for the use of chemical agent." Doher Aff. ¶ 21. In similar cases, checking with medical professionals before the use of a chemical agent absolves corrections officers of liability. See, e.g., Conner v. Kirkegard, et al., No. CV 15-81-H-DLC, 2018 WL 830142, at *5 (D. Mont. Feb. 12, 2018) (finding no liability after defendant and cellmate were medically cleared for spray prior to cell extraction in accordance with policies); Thomas v. Johnson, No. 1:05CV197 LMB, 2007 WL 2885341, at *6 (E.D. Mo. Sept. 27, 2007) (granting motion for summary judgment when officer properly checked with medical staff before applying the pepper spray with noncompliant inmate).

This medical clearance is not dispositive here because plaintiff has presented evidence of a well-documented history of asthma in the prison. Because Lieutenant Doher was in charge of 10 Block during the fire which triggered Washington's asthma attack, the Court concludes that there is a genuine dispute about whether Doher knew of Washington's asthma when he ordered the use of a chemical agent. Indeed, Doher has not disputed knowledge about the asthma. See Blackfoot v. Mijares, No. CV 07-6044-JVS PJW, 2011 WL 3477024, at *4 (C.D. Cal. June 27, 2011), report and recommendation adopted, No. WD CV 07-6044-JVS, 2011

WL 3476573 (C.D. Cal. Aug. 9, 2011). Accordingly, it is a jury question as to whether Doher knowingly authorized the use of force on an asthmatic and whether it was excessive in the circumstances.

The record is thin on whether the other officers knew of Washington's asthma. None of the other officers submitted an affidavit on point. While Plaintiff told the extraction team he was allergic to black mold, an allergy to black mold is not the same as having asthma. The officers were not assigned to 10 Block, and there is no evidence that Washington interacted with them before the extraction. See Cronin Aff. ¶ 2, Dkt. No. 131; Clement Aff. ¶ 2, Dkt. No. 130; Dankievitch Aff. ¶ 2, Dkt. No. 132; Savastano Aff. ¶ 2, Dkt. No. 135. Moreover, although Washington argues that there is a question of fact as to whether it was reasonable to use a chemical agent on a noncompliant prisoner, DOC regulations allow for the use of force when an inmate "refus[es] to be put in restraints and exit a cell." 103 Mass. Code Regs. 505.07.

Therefore, the Court concludes that the other defendants are protected by qualified immunity on the excessive force claim.[4] As such, claims against Sergeant Dankievitch and Officers

---

[4] Plaintiff does not appear to be pressing a claim based on the earlier allegations that his head was slammed into the floor or his hand was broken.

14

Capodilupo, Jr., Clement, Cronin, and Savastano are dismissed, but the claim against Lieutenant Doher will go forward.

   **B. Retaliation**

Washington alleges that Lieutenant Doher retaliated against him for filing so many grievances.[5] To survive summary judgment on a retaliation claim, "a prisoner must make out a prima facie case by adducing facts sufficient to show that he engaged in a protected activity, that the state took an adverse action against him, and that there is a causal link between the former and the latter." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).

Washington testified that on the day he filed a grievance against an officer who had a close relationship with Doher, he was moved to a cell that contained black mold. Washington also testified that when he was in the recreation cage, and prior to the use of force, Lieutenant Doher "look[ed] me in my eye" and said, "you have been writing grievances against my officers." Washington Dep. Tr. at 101. He claims Doher authorized the use of chemical agents against him, despite knowing of his asthma,

---

[5] In his deposition testimony, Washington alleges various actions by Lieutenant Doher he considered retaliatory. He testifies that Doher authorized unnecessary cell searches, ordered moves from cell to cell, permitted officers to treat his items carelessly, and falsified tickets against him. Washington Dep. Tr. at 76, 90. However, in his brief, he does not press these allegations.

as a means of targeting, harassing, and retaliating against him. Washington Dep. Tr. at 105.

Doher argues that he has never seen any of Washington's grievances or taken any action in retaliation against Washington for filing grievances against him. He alleges that Washington was moved due to security issues and to repair a broken door; moreover, he had not seen mold in cell 36. Doher Aff. ¶¶ 16-18.

With respect to the retaliation claim, Lieutenant Doher is not entitled to summary judgment because the right not to be retaliated against for filing grievances is clearly established in this Circuit, and plaintiff has presented evidence that Doher was motivated by plaintiff's frequent filing of grievances.

## ORDER

Defendant Doher's motion for summary judgment is **DENIED**. The motion for summary judgment filed by the remaining defendants is **ALLOWED**. (Dkt No. 202).

/s/ PATTI B. SARIS
Patti B. Saris
Chief U.S. District Judge